**In re Bernard JOHNSON, Appellee.**

No. 95–FM–1595.

District of Columbia Court of Appeals.

Argued Jan. 7, 1997.
Decided March 13, 1997.

Richard F. Gondelman, Assistant Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel, and Charles L. Reischel and Janet L. Maher, Deputy Corporation Counsels, were on the brief, for appellant District of Columbia Commission on Mental Health Services.

Laurie B. Davis, with whom James Klein was on the brief, for appellee.

Before FERREN, SCHWELB, and FARRELL, Associate Judges.

FERREN, Associate Judge:

The District of Columbia Commission on Mental Health Services (CMHS) appeals from the trial court's order dismissing its petition for involuntary civil commitment of Bernard Johnson for outpatient psychiatric treatment pursuant to D.C.Code § 21–541 (1989 Repl.). The trial court ruled that it could not involuntarily commit Johnson for outpatient treatment because Johnson already was listed on CMHS's rolls as an individual receiving voluntary outpatient treatment. CMHS argues that this ruling—that a voluntary outpatient cannot be committed involuntarily for outpatient treatment—is inconsistent with the Hospitalization of the Mentally Ill Act, Pub.L. No. 89–183, 79 Stat. 751 (1965) (codified as amended at D.C.Code § 21–501 to –592) ("Ervin Act"). We agree with CMHS and reverse.

**I.**

Johnson was admitted on an emergency basis to Saint Elizabeths Hospital on June 20, 1994, after an incident where, according to the police officer who took him to the

hospital, Johnson talked about killing himself and his family and had turned on all the gas in the house. The officer filed an application for emergency hospitalization in accordance with D.C.Code § 21–521.[1] On June 21, 1994, at the request of CMHS, a judge authorized the hospital to detain Johnson for up to seven days for emergency observation and diagnosis pursuant to D.C.Code § 21–523.[2] On June 24, 1994, CMHS filed a timely petition with the Superior Court's Commission on Mental Health (the Commission)[3] for indefinite judicial hospitalization under D.C.Code § 21–541.[4]

As required by D.C.Code § 21–542, the Commission held a hearing on September 15, 1994, to consider Johnson's mental health status and the propriety of further commitment proceedings.[5] The Commission concluded that Johnson was mentally ill and, as a result of that mental illness, was a danger to himself and others unless properly supervised. The Commission noted that Johnson's condition had improved considerably during his stay at Saint Elizabeths and recommended Johnson's commitment as an out-

patient and supervised treatment from a Community Mental Health Center. The Commission also asserted that Johnson did not object to commitment as an outpatient. Johnson, however, ultimately requested a jury trial on the question of whether he could be committed. Johnson was released to the community for outpatient treatment pending trial. In September 1995, CMHS alleged that Johnson was not complying with his outpatient treatment and applied to have him returned to the hospital. The trial court granted CMHS's application but stayed execution of the order before Johnson was in fact returned to the hospital.

Johnson moved to dismiss the petition for commitment, arguing that because he was listed as a voluntary outpatient on the rolls of CMHS, the Ervin Act prohibited conversion of his legal status to involuntary outpatient. The trial court agreed and dismissed the commitment petition.

## II.

Johnson raises two preliminary challenges to the propriety of our reaching the merits in

---

1. D.C.Code § 21–521 provides, in relevant part: [A]n officer authorized to make arrests in the District of Columbia ... who has reason to believe that a person is mentally ill, and, because of the illness, is likely to injure himself or others if he is not immediately detained may, without a warrant, take the person into custody, transport him to a public or private hospital, and make application for his admission thereto for purposes of emergency observation and diagnosis. The application shall reveal the circumstances under which the person was taken into custody and the reasons therefor.

2. D.C.Code § 21–523 provides:
A person admitted to a hospital [in response to an application filed under § 21–521] may not be detained in the hospital for a period in excess of 48 hours from the time of his admission, unless the administrator of the hospital has, within that period, filed a written petition with the court for an order authorizing the continued hospitalization of the person for emergency observation and diagnosis for a period not to exceed 7 days from the time the order is entered.

3. The Superior Court's Commission on Mental Health (the Commission) should be distinguished from the similarly titled Commission on Mental Health Services (CMHS). The Commission is a quasi-adjudicative body established by law; the Superior Court appoints its nine members—one

lawyer as chairperson and eight practicing physicians—as prescribed by D.C.Code § 21–502. Before a petition for involuntary civil commitment is turned over to the trial court, the Commission must hold a hearing to determine, preliminarily, whether the individual is properly subject to such commitment proceedings. See D.C.Code § 21–544. If the Commission finds that commitment is appropriate, it forwards its recommendation to the Superior Court, which holds a hearing, with or without jury, to determine the individual's final legal status. See D.C.Code § 21–545.

CMHS, in contrast, is part of the Department of Human Services and provides mental health services to District residents at Saint Elizabeths Hospital and regional outpatient centers.

4. D.C.Code § 21–541(a) provides in relevant part: "Proceedings for the judicial hospitalization of a person in the District of Columbia may be commenced by the filing of a petition with the Commission on Mental Health ... by a duly accredited officer or agent of the Department of Human Services...."

5. D.C.Code § 21–542(a) provides where pertinent: "The Commission shall promptly examine a person alleged to be mentally ill after the filing of a petition under section 21–541 and shall thereafter promptly hold a hearing on the issue of his mental illness."

this case. Johnson first argues that CMHS has no right to appeal the order dismissing the commitment petition. He also contends this case is moot. We disagree on both counts.

## A.

Johnson relies on *In re Lomax,* 386 A.2d 1185 (D.C.1978) (en banc), for the proposition that the government (here CMHS) has no right to appeal the trial court's dismissal of the commitment petition in this case. In *Lomax,* an involuntary civil commitment proceeding, a jury found that although Lomax was mentally ill, he was not likely to injure himself or others as a result of his mental illness. *See id.* at 1187. The trial court accordingly dismissed the commitment petition and ordered Lomax's release. *See id.* The government appealed, arguing that statements made during the opening argument of Lomax's counsel were so prejudicial that they tainted the verdict and required a new trial. *See id.* We held that the statutory scheme, which had been enacted out of a " 'profound congressional concern for the liberties of the mentally ill,' ". *id.* at 1188 (quoting *Covington v. Harris,* 136 U.S.App. D.C. 35, 41, 419 F.2d 617, 623 (1969)), did not envision or permit government appeals from adverse jury findings. *See id.* We also noted that there was "no logical reason" for a government appeal, since the government could always reinitiate commitment proceedings by filing a new petition against Johnson. A "retrial," therefore, would be a nonsequitur because the issue would be the same as at an entirely new proceeding: the current mental state of the respondent, not the mental state at the time of the original trial. *Id.* at 1189.

Johnson argues that in the present case, as in *Lomax,* a government appeal is pointless because CMHS always can file a new commitment petition and start the institutionalization process anew. In fact, as Johnson and CMHS note in their briefs, CMHS twice has initiated involuntary commitment proceedings against Johnson after the trial court's dismissal in this case.

CMHS responds by drawing our attention to *In re Barlow,* 634 A.2d 1246 (D.C.1993), where the District sought to appeal a trial

court order dismissing the hospital's petition for a short-term involuntary commitment of Barlow for up to seven days. The trial court had concluded that Barlow had not been provided a court hearing within the statutorily mandated twenty-four hour period. *See id.* at 1247–49. Barlow argued, as does Johnson in the present case, that the Ervin Act did not authorize the government to appeal the dismissal order. We disagreed, distinguishing *Lomax* as a case where the government sought to appeal an order of dismissal resulting from a full adjudication on the merits. *See Barlow,* 634 A.2d at 1248. The *Barlow* court, presented with a legal challenge to the trial court's interpretation of what satisfied the requirement of D.C.Code § 21–525 that a hearing be "held" within twenty-four hours, agreed to hear the government's appeal:

> Were the hospital to be denied the right of appeal in this instance there would be no avenue for this court to review and resolve the inconsistent interpretations of § 21–525 presented in this case. *Lomax* notwithstanding, we find that the government retains a narrow channel of appeal in Ervin Act cases that implicate fundamental questions as to the procedure by which the statutorily prescribed hospitalization or commitment process is completed.

*Barlow,* 634 A.2d at 1248–49.

The trial court concluded that Johnson could not be involuntarily committed as an outpatient because he was listed on CMHS's rolls as a voluntary outpatient. Very likely CMHS will be plagued with inconsistent rulings by trial courts unless we answer the legal question whether and, if so, how an individual may be involuntarily civilly committed when classified at the time as a voluntary outpatient. As in *Barlow,* the trial court dismissed the petition on legal, not factual, grounds. We cannot agree with Johnson's assertion in his brief that "[t]he court made a factual determination regarding Mr. Johnson's committability, that [Johnson] who had been receiving outpatient treatment voluntarily remained willing to receive outpatient treatment and, thus, in this case there was no necessity for the court to order involuntary treatment." The court could not and

did not make any factual finding; the court heard no evidence whatsoever on the question of whether Johnson was committable— indeed, the case was scheduled for a jury trial to resolve this very issue. Rather, the court concluded that Johnson's *status* as a voluntary outpatient precluded conversion of that status to involuntary outpatient. Whether this reasoning is correct or not— and we ultimately reject it—it cannot be considered a factual conclusion. The only "facts" relevant to the court's analysis were: (1) that Johnson was a voluntary outpatient, and (2) CMHS sought to change his status to involuntary outpatient. Whether and how the government can achieve such a transformation of legal status is precisely the kind of fundamental procedural question the government can appeal under *Barlow*.

## B.

■ We also reject Johnson's mootness challenge to CMHS's appeal. CMHS does not appear to dispute that the case is moot in the sense that CMHS has no concrete interest in the outcome of the appeal. CMHS contends, rather, that we should exercise our discretion to the hear the case because it concerns issues that are "capable of repetition, yet evading review." The Supreme Court has limited this doctrine to cases where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam). However, "[t]his court has declined to adhere strictly to the requirements set forth in *Weinstein.*" *In re W.L.,* 603 A.2d 839, 841 (D.C.1991). We have rejected mootness concerns, for example, in several cases where the second *Weinstein* prong was not satisfied but the case "involved overarching issues important to the resolution of an entire class of future" cases. *McClain v. United States,* 601 A.2d 80, 82 (D.C.1992); *accord Lynch v. United States,* 557 A.2d 580 (D.C.1989) (en banc).

Johnson argues that this case is not "in its duration too short to be fully litigated prior to its cessation or expiration." *Weinstein,* 423 U.S. at 149, 96 S.Ct. at 349. Johnson notes that we have previously allowed the government to appeal dismissal of a commitment petition only in the context of emergency or temporary commitments. *See Barlow,* 634 A.2d at 1249 (rejecting suggestion of mootness when trial court dismissed petition for seven-day period of commitment for treatment and diagnosis). Johnson contrasts *Barlow* with the present case, where CMHS was seeking an order of indefinite commitment and the dismissal did not occur during the emergency phase. According to Johnson, CMHS should have sought a stay of the execution of the trial court's order pending appeal.

Johnson's argument for a stay hardly provides an adequate resolution, however. As we noted in *Lomax,* the Ervin Act "gives no authority for detention pending appeal," 386 A.2d at 1189 n. 15, and thus it seems extremely unlikely that a court would have been authorized to stay execution of its order releasing Johnson from the earlier commitment order which had been operative pending his trial. In *Barlow* itself, it was not the emergency nature of the proceedings that rendered them too short in duration to be fully litigated before becoming moot; rather, mootness arose from the very structure of the Ervin Act, under which "the hospital is required to release the patient when a violation" of the brief statutory time limit occurs. 634 A.2d at 1249–50.

The issue presented in the present case— whether and how a voluntary outpatient can be committed as an involuntary outpatient— will consistently evade review because the case always will become moot if CMHS suffers an adverse ruling in the trial court. In order for the government's right of appeal "in Ervin Act cases that implicate fundamental questions [of] procedure" to have any substance, *Barlow,* 634 A.2d at 1249, CMHS must be able to pursue an appeal when faced with kinds of mootness concerns such as those presented in the instant case.

Johnson apparently does not dispute that the second *Weinstein* factor obtains in the present case. According to the briefs, Johnson already has been the subject of further

commitment proceedings since the dismissal of this case. It appears likely, therefore, that CMHS repeatedly will be subject to dismissals of commitment petitions if other trial judges follow the reasoning of the trial judge in this case. *See Barlow,* 634 A.2d at 1249 (rejecting mootness concerns since "the appellant-hospital (and the trial courts themselves) will repeatedly encounter instances in which the § 21–525 maximum time period will expire prior to the conclusion of probable cause hearings"). Thus, CMHS, the "complaining party," will likely "be subjected to the same action again" of which it complains in court.

In commitment proceedings such as *Barlow* and the present case, moreover, it is the trial court's action—dismissing the commitment petition—that renders the case moot. *See id.* We therefore choose to exercise our discretion to hear the merits of CMHS's appeal. While this case may not be "capable of repetition, yet evading review" in the strict sense set forth in *Weinstein,* it is capable of repetition without review in the sense we have used in *In re W.L., McClain,* and other cases. *See also Lynch v. United States,* 557 A.2d 580 (D.C.1989) (en banc). We believe this case presents important questions concerning the implementation of the Ervin Act that would consistently evade appellate review and frustrate our trial courts unless we resolve today the underlying legal dispute.

### III.

■ We turn, then, to the merits of CMHS's appeal. The trial court agreed with Johnson that he could not be converted from a voluntary outpatient to an involuntary outpatient. Johnson defends the trial court's order as a proper application of the principles enunciated in *In re Blair,* 510 A.2d 1048 (D.C.1986), where we held that an individual voluntarily receiving *inpatient* treatment cannot be subjected to involuntary civil commitment proceedings while still in the hospital. The trial court concluded that this reasoning applies with equal strength when CMHS or the Commission proposes a change in status from voluntary outpatient to involuntary outpatient. Johnson argues that he must receive a discharge from voluntary out-

patient treatment before he can be committed as an involuntary outpatient. CMHS responds that there is a fundamental difference between voluntary outpatients and voluntary inpatients that renders Johnson's proposed analogy to *Blair* inapt. Ultimately, we agree with CMHS and conclude that an individual on CMHS's rolls as a voluntary outpatient who meets the statutory criteria for civil commitment may be involuntarily committed as an outpatient, when CMHS or the Commission proposes nothing more than conversion of the individual's outpatient status from voluntary to involuntary.

### A.

In light of Johnson's heavy reliance on *Blair,* a brief recap of its facts and our opinion will set the stage for resolution of the present case. Blair was receiving outpatient psychiatric treatment from one of the District's Community Health Centers when he contacted one of its nurses and told her he needed help. *See id.* at 1049. Blair agreed with the nurse's assessment that hospitalization was necessary to prevent further deterioration of his mental condition and presented himself the following day to sign himself into the hospital, smelling of alcohol and appearing inebriated. *See id.* The psychiatrist who examined Blair feared that Blair would sign himself out as soon as he was sober and, therefore, sought Blair's admission to St. Elizabeths as an involuntary emergency patient pursuant to D.C.Code § 21–521. *See Blair,* 510 A.2d at 1049–50.

Blair requested dismissal of the trial court's order authorizing a seven-day commitment for treatment and observation under D.C Code § 21–523; the court denied Blair's motion, and Blair appealed. *See Blair,* 510 A.2d at 1049–50. We reversed, concluding that Blair could not be the subject of involuntary commitment proceedings while he was voluntarily receiving inpatient treatment. *See id.* at 1050. We noted that under the Ervin Act, a mentally ill individual who seeks voluntary hospitalization "must be admitted on a voluntary basis." *Id.* A voluntary patient also has an absolute right to demand release from the hospital, which must comply with the patient's request within forty-eight

hours. *See id.* We therefore concluded that, to allow the hospital to initiate involuntary commitment proceedings while the individual was still receiving inpatient treatment voluntarily would violate the "spirit and the purpose" of the Ervin Act; i.e., "the forced detention of those seeking voluntary hospitalization would defeat the Act's purpose of encouraging voluntary admission," *id.* at 1050. Blair's statutory right as a voluntary patient to request a discharge would have been meaningless if, once the hospital admitted him voluntarily, it could turn around and seek to commit him. In language that is particularly helpful in resolving the present case, we concluded:

> [T]he decision to have [Blair] admitted on an involuntary basis was premature.... If, upon his release into the community, [Blair] had displayed behavior that indicated he was dangerous to himself or to others, it would have been appropriate to promptly seek his involuntary, emergency hospitalization.

*Id.* at 1051.

### B.

We begin our analysis by clarifying what Johnson is *not* arguing. Johnson does not contend that the Ervin Act prevents CMHS from initiating emergency hospitalization procedures against an individual voluntarily receiving outpatient treatment. At oral argument Johnson conceded, moreover, that CMHS may seek the indefinite *inpatient* commitment of a voluntary outpatient if that is the least restrictive means necessary to protect the safety of that individual and the public. What CMHS cannot do, according to Johnson, is obtain a commitment order that would simply alter his legal status from voluntary to involuntary without altering his course of treatment. Under Johnson's theory, therefore, a court cannot convert an individual's legal status from voluntary inpatient to involuntary inpatient, as in *Blair*, or from voluntary outpatient to involuntary outpatient, as in the present case.

Johnson's reliance on *Blair* does not work. An individual voluntarily receiving inpatient treatment in a hospital stands in a position far different from that of someone who is listed on CMHS's rolls as an outpatient. In emphasizing the importance of encouraging mentally ill individuals to seek treatment proactively, *Blair* recognized the extraordinary chilling effect of allowing the hospital to detain, indefinitely, an individual who was admitted of her own free will. The result in *Blair* was also compelled by D.C.Code § 21–512, which gives voluntarily hospitalized individuals the right to demand their release within forty-eight hours.

An understanding of the operation of the Ervin Act reinforces the correctness of *Blair*'s reasoning and the inaptness of Johnson's proposed analogy between voluntary inpatients and voluntary outpatients. When someone voluntarily checks into a hospital to receive inpatient psychiatric treatment, that person becomes immune to the judicial commitment procedures of the Ervin Act not only because the Act, at a structural level, encourages voluntary admissions, but also because that individual no longer meets the statutory (and constitutional) definition of a committable person. The government can commit indefinitely only a person who "is mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty." D.C.Code § 21–545(b). By definition, an individual receiving inpatient treatment cannot be a danger to self or others.[6] It is difficult, therefore, to discern any significant government interest in curtailing the legal rights of such a voluntary inpatient.

The same legal and policy analysis does not apply to an individual listed on CMHS's rolls as a voluntary outpatient. The outpatient's deteriorating mental condition or unwillingness or inability to follow through on medication or counseling can lead to a situation where judicial commitment is authorized by statute. In the present case, for example, CMHS alleges that Johnson's failure to com-

---

6. *Blair*'s underlying premise is the voluntary inpatient's "amenab[ility] to voluntary treatment." *Blair*, 510 A.2d at 1050 (citing *In re Curry*, 152 U.S.App. D.C. 220, 224 & n. 8, 470 F.2d 368, 372 & n. 8 (1972) (nothing in record suggests Curry "resisted voluntary treatment")).

ply with his plan of treatment has rendered him a danger to himself and others.

Johnson does not dispute this distinction between voluntary outpatients and inpatients; rather, he argues that if the result of the hearing before the Commission on Mental Health is a recommendation of outpatient commitment, the petition for judicial hospitalization becomes invalid because the court only would be converting the respondent's status from voluntary to involuntary without altering his course of treatment. To a limited extent we agree with Johnson. We have no problem with Johnson's assertion that, if he was found to have been cooperating in his outpatient treatment, and the treatment was proceeding successfully, he could not be subjected to an order of judicial commitment because of unsubstantiated concerns that at some point in the future he might discontinue his voluntary treatment. The very issue the jury was to decide in this case—before the trial court dismissed CMHS's petition for involuntary civil commitment—was whether Johnson, if left to his own devices as a voluntary outpatient (i.e. "at liberty" in the statutory language of D.C.Code § 21–545(b)), would be dangerous to himself or others as a result of mental illness. In other words, before the Commission on Mental Health could make the required ruling in support of CMHS's petition for commitment (and before the jury could have properly returned a finding of committability) the Commission had to find that Johnson was, as a factual matter, unwilling or unable to comply with the recommended course of voluntary treatment, irrespective of his prior *status* as a voluntary outpatient.

The undesirability, from a legal and public policy perspective, of preventing CMHS from instituting civil commitment proceedings against noncompliant individuals listed on its rolls as outpatients becomes clearer when viewed in the context of what Johnson contends should have happened before he could have been committed as an outpatient. In his brief, Johnson argues:

> Under *Blair*, the hospital clearly had the option of discharging Mr. Johnson from his voluntary status if it was of the opinion that he was refusing treatment, as demonstrated by an alleged failure to comply with the treatment plan or to take medications as prescribed. Then the hospital could have pursued his commitment for outpatient treatment without running afoul of [the Ervin Act].

(Citation omitted.) Thus, Johnson's bottom line appears to be that the only error in this case was that CMHS failed to "discharge" Johnson from his "voluntary status" before initiating involuntary commitment proceedings.

This argument is deeply flawed for three reasons. First, it makes very little sense to require dismissal of a commitment petition because of the failure of CMHS to perform a purely administrative and ministerial act: the discharge of Johnson from voluntary status. Such a requirement does nothing to protect Johnson's interest in remaining free of restraints on his liberty, especially since CMHS itself files the petition for commitment and is the entity that would discharge Johnson from its rolls. Nor does this discharge requirement serve any public policy interest. In short, imposing the discharge requirement demanded by Johnson would do nothing but create a technical and, according to Johnson himself, an easily surmountable procedural barrier to placing mentally ill individuals under a legal regime deemed essential to ensure that they do not injure themselves or others. *Cf. In re Herman*, 619 A.2d 958, 968 (D.C.1993) (en banc) ("The interests of a person who in fact is a danger to herself if not hospitalized would not necessarily seem well served by releasing her solely because of some procedural defect in the mechanism by which she has come to be hospitalized for emergency observation and diagnosis.").

Second, and perhaps more importantly, we note that a court-sanctioned agreement between the District and individuals receiving psychiatric care from CMHS affirmatively *prohibits* CMHS from discharging from its rolls any client with a "major mental illness" unless the client requests the discharge in writing, dies, moves out of the District, has been placed on "inactive status for a continuous period of at least two years," or is "incarcerated for more than 12 months." *Dixon v. Sullivan*, No. 74–285, Agreement at 6 (D.D.C. Jan. 28, 1992) (consent decree be-

tween plaintiffs and District). We can hardly fault CMHS for failing to take an action that a court order forbids it to take.[7]

Finally, although we do not decide the matter, there would appear to be room, even under *Blair,* for a petition to seek involuntary commitment of a voluntary inpatient who no longer is "amenable to voluntary treatment." *Blair,* 510 A.2d at 1050; see *supra* note 6. Thus, although we distinguish *Blair* by stressing the distinction between outpatient and inpatient status, the ultimate distinction is amenability to treatment while in outpatient or inpatient status—an amenability that can be withheld easily by a voluntary outpatient and at least theoretically, perhaps even actually, by a voluntary inpatient.

\*     \*     \*     \*     \*     \*

We conclude, therefore, that the trial court erred in dismissing the petition to commit Johnson as an involuntary outpatient because of Johnson's status as a voluntary outpatient. Accordingly, the judgment appealed from is

*Reversed.*[8]

---

7. This case does not present the question whether the District could initiate commitment proceedings resulting in outpatient placement if the client's failure to obtain the necessary treatment were a result of the District's failure to honor its obligations to its clients under the Constitution and under the *Dixon* consent decree. *Cf. In re Mills,* Ment. H. No. 244–90 (D.C.Super.Ct. March 16, 1990) (dismissing commitment petition where Mills's failure to follow through with prescribed treatment was attributed to inadequa-cies of CMHS's efforts to ensure Mills received the necessary treatment).

8. Given the mootness of the case, see *supra* part II.B, we do not remand to the Superior Court for reinstation of the commitment petition. The District remains free, of course, to instigate or pursue other commitment petitions if Johnson's current mental status so dictates.