**In re Elijah PETERSON, Appellant.**

**No. 06–FM–1333.**

District of Columbia Court of Appeals.

Argued Feb. 6, 2009.

Decided Dec. 3, 2009.

Laurie B. Davis, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief for appellant.

Stacy L. Anderson, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee.

Before RUIZ, KRAMER, and BLACKBURNE–RIGSBY, Associate Judges.

KRAMER, Associate Judge:

Appellant Elijah Peterson admitted himself as a voluntary inpatient at the Washington Hospital Center ("WHC"). After he requested a discharge, he was transferred to St. Elizabeths Hospital as an emergency, involuntary patient. Judge Linda Davis denied Peterson's motion to dismiss an application for an emergency seven-day hospitalization. In this appeal, Peterson argues that the transfer to St. Elizabeths as an involuntary inpatient violated his rights under The Hospitalization of the Mentally Ill Act, known as the Ervin Act, D.C.Code §§ 21–501 to –592 (2001). We affirm.

## I. Factual Background

Elijah Peterson requested admission to WHC on September 2, 2006, to seek treatment for his bipolar disorder and schizophrenia, as well as certain physical injuries. He was admitted to WHC's psychiatric unit as a voluntary inpatient after his physical injuries were treated in the emergency room. Peterson requested that he not be placed on medication while at WHC, but he was medicated anyway. At WHC, Peterson attended group thera-

py sessions and participated in anger management groups.

Peterson requested to be discharged from WHC on September 3, 2006,[1] and again on September 12, 2006. WHC staff began to process Peterson's September 12 request for release, but were concerned about releasing him because of his aggressive behavior at WHC, which included hitting his head against the wall, yelling at a doctor, and assaulting staff. Dr. Martin Chin, Peterson's attending physician at WHC, completed an emergency hospitalization form (an FD–12) seeking Peterson's involuntary hospitalization pursuant to D.C.Code § 21–521. On September 14, WHC staff told Peterson that he would be discharged and going home, but an ambulance crew picked him up at WHC and transported him on a stretcher directly to St. Elizabeths. Peterson was then admitted as an involuntary inpatient to St. Elizabeths.

On September 15 the District government petitioned the Superior Court for an order authorizing the continued detention of Peterson for emergency observation and diagnosis pursuant to D.C.Code § 21–523. The trial court issued the order and counsel was appointed for Peterson. Peterson requested a probable cause hearing pursuant to D.C.Code § 21–525. At the hearing, he moved to dismiss the government's petition on the ground that his transfer to St. Elizabeths had been illegal. Dr. Abayomi Jaji, Peterson's treating physician at St. Elizabeths, testified that he understood Peterson had been transferred from WHC to St. Elizabeths because "he was getting very aggressive, they couldn't manage him, and he was becoming very violent against

the staff." More specifically, Peterson was "throwing things at staff ..., ripping things off the wall like a picture, and he was boisterous, getting in the face of [WHC] staff as if he was going to attack them."[2] Dr. Jaji further testified that Peterson was described as demonstrating "aggressive impulsive urges to the point of violence, attacking people for no clear reasons, very irritable to the point [that] almost anything you say to him can provoke him ... to be aggressive."

Peterson argued that he was a voluntary inpatient at WHC and thus was entitled to be released upon his request pursuant to D.C.Code § 21–512(a). The trial court disagreed and denied Peterson's motion to dismiss in an oral ruling from the bench, stating that "there was nothing wrong in the decision to convert him from voluntary to involuntary even while he was still in a hospital setting." In its ruling, the court stated that "what the Court finds from the facts presented to it regarding Mr. Peterson is that ... while he initially went [into WHC] voluntarily to seek treatment, he became unamenable to treatment." On October 2, 2006, the trial court was notified that Peterson's status at St. Elizabeths had been changed to voluntary on September 25, 2006, and the case was dismissed.

## II. Discussion

Peterson argues that his admission to St. Elizabeths as an emergency involuntary patient violated his rights under the Ervin Act, D.C.Code §§ 21–501 to –592 (Supp.2009), because he had voluntarily

---

1. Peterson testified that his September 3 discharge request was improperly rescinded by the staff of WHC, who forged his signature on the portion of the discharge slip requesting rescission.

2. Dr. Jaji also testified extensively about Peterson's aggressive behavior at St. Elizabeths, but this testimony is irrelevant to the question of whether the transfer to St. Elizabeths was allowable.

sought admission to WHC. On the facts of this case, we cannot agree.

Under the Ervin Act, "[a] person may apply to a public or private hospital in the District of Columbia for admission to the hospital as a voluntary patient for the purposes of observation, diagnosis, and care and treatment of a mental illness." *Id.* § 21–511. The statute also provides:

> A person accepted for voluntary treatment by a hospital ... may, at any time, if the person is 18 years of age or over, obtain his or her release from the hospital or other treatment by filing a written request with the chief of service.... Within a period of 48 hours after the receipt of the request, the chief of service ... shall ensure that discharge planning is completed and release the person making the request.

*Id.* § 21–512(a). In general, voluntary inpatients may not be converted to involuntary status under § 21–521.[3] Conversion of a voluntary inpatient to involuntary inpatient status is problematic because "the statutory scheme which provides for voluntary admission ... was created so as to encourage admission without legal proceedings." *In re Curry,* 152 U.S.App. D.C. 220, 224, 470 F.2d 368, 372 (1972) (citation omitted). With the Ervin Act, Congress recognized that the forced detention of those seeking voluntary hospitalization would defeat the Act's purpose of encouraging voluntary admissions. In this regard, they refused to enact legislation which would allow the status of a voluntary patient to be changed to an involuntary admission through the filing of a judicial petition.

*In re Blair,* 510 A.2d 1048, 1050 (D.C. 1986).

But the general rule is not absolute; the Ervin Act carves out an exception to the general rule for emergency situations. *See* D.C.Code § 21–521. While there is tension between the right of a voluntary inpatient to seek release pursuant to D.C.Code § 21–512(a) and the involuntary hospitalization authorized by § 21–521, contrary to appellant's arguments, there is "no statutory provision and no case law ... which preclude the conversion of a voluntary inpatient to an involuntary inpatient" in extreme cases. *In re Clark,* 700 A.2d 781, 785 (D.C.1997). Rather, the right to release under § 21–512 is necessarily limited by the applicability of § 21–521 in truly urgent situations where the imminent dangerousness requires detention of an individual who is no longer amenable to treatment. Our cases have recognized that this is a last resort exception where emergency hospitalization is determined to be the least restrictive way to ensure the safety of the individual and the public.

In *In re Johnson,* we held that a voluntary outpatient may be committed involuntarily for outpatient treatment, but further noted that, "although we do not decide the matter, there would appear to be room, even under *Blair,* for a petition to seek involuntary commitment of a voluntary inpatient who no longer is 'amenable to voluntary treatment.' ... [T]he ultimate distinction is amenability to treatment while in outpatient or inpatient status." 691 A.2d 628, 635 (D.C.1997) (citations omitted). Subsequently, we upheld the invol-

---

3. D.C.Code § 21–521 states:

> [A] physician or qualified psychologist of the person in question, who has reason to believe that a person is mentally ill and, because of the illness, is likely to injure himself or others if he is not immediately detained may, without a warrant, take the person into custody, transport him to a public or private hospital, and make application for his admission thereto for purposes of emergency observation and diagnosis.

untary commitment of a voluntary inpatient who had

> been subjected to an arrest warrant for sexually assaulting a hospital employee; been found to be mentally ill, incompetent to stand trial, and a danger to himself and others; but also, while in both voluntary and involuntary inpatient status [had] continued to resist treatment by proclaiming that he is not mentally ill, even as his mental health condition has deteriorated to the point of requiring supervision to ensure that he takes his medication and that he does not engage in violent unprovoked sexual behavior.

*In re Clark, supra*, 700 A.2d at 786. In short, the patient in *Clark* was "no longer was amenable to treatment as a voluntary inpatient." *Id.*

More recently, we concluded that a patient "was not consistently amenable to voluntary treatment"—hence could be admitted involuntarily—where there were numerous "instances of her disobeying doctors orders while being voluntarily treated, refusing to take her prescribed medicines, and declining to participate in programs to help her assimilate into society. Periods of stability achieved through hospitalization were followed by episodes of deterioration after her release." *In re Lanier*, 905 A.2d 278, 283 (D.C.2006).[4]

Peterson's case was an urgent situation, as Peterson had shown himself to be an immediate danger to himself or others. Although Peterson's behavior at WHC was not as extreme as that exhibited contemporaneously by the patients in *Clark* or *Lanier*, there was nonetheless evidence that he was mentally ill and that, because of the illness, he posed an immediate danger to himself or others unless hospitalized for treatment. *See* D.C.Code § 21–521. The FD–12 form, the emergency hospitalization form, executed on September 14, 2006, stated that Peterson "demonstrates labile affect with rapid escalation to verbal threats, profanity and physical violence. He has called bomb threats to the police and damaged unit doors and locks. He removed pictures from the wall and attempted to assault staff."

Considering Peterson's dangerousness, the question is whether Peterson was amenable to voluntary treatment on September 14, 2006, when he was transferred to St. Elizabeths as an emergency involuntary inpatient. The trial court found that he was not, and that finding has support in the record. *See* D.C.Code § 17–305(a) (2001). At trial, Dr. Jaji testified that Peterson was not taking his medication consistently, some days refusing all medication.[5] Dr. Jaji characterized Peterson's mental state upon admission to St. Elizabeths as a manic state, and explained that "[w]hen he's in the very high energy manic state he feels like he doesn't need anything, he doesn't need medication, he's not ill." Peterson himself repeatedly admitted on the stand that he does not take the majority of his prescribed medications. He explained "I go to nobody for treat-

---

**4.** The involuntary commitment of Lanier was also supportable because the petition for involuntary hospitalization had been filed before Lanier admitted herself for voluntary treatment; accordingly, there was no concern about the chilling effect of allowing a hospital to involuntarily detain a person who had voluntarily sought inpatient treatment. 905 A.2d at 282. Nonetheless, the commitment was upheld ultimately because Lanier "was not consistently amenable to voluntary treatment." *In re Lanier, supra*, 905 A.2d at 283.

**5.** Peterson also refused therapy while at WHC. Despite initially claiming to have never missed a therapy session, Peterson did not deny missing group therapy sessions at WHC on September 3 and September 4, including anger management group therapy.

ment, because my father don't want me on the medication ... only time I take my medication is when I want to go to sleep." Later in his testimony, Peterson elaborated on his father's opposition to medication and the effect on his treatment: "My dad is a doctor. He's into herbal vitamins and medications ... he said that legal medications is not pure.... He told me ... that patient advocate book, handbook, ... says for me that I can refuse my medication." He concluded his testimony with the declaration, "I have to wean myself off the medication." Peterson's testimony reveals his justification for refusing medication while at WHC and strongly supports the conclusion that he would not have been amenable to voluntary treatment.[6]

Additionally, Peterson has a long history of mental illness. While at home before the voluntary admission, he was prescribed seven daily medications. There was, however, evidence of a recurrent failure on his part to take the medicine necessary for his schizo-affective disorder. He testified that he had been taken to the Comprehensive Psychiatric Emergency Program (CPEP)[7] by the police about ten times since 2000. Given these facts, it was not improper for the trial court to find him unamenable to voluntary treatment and that involuntary hospitalization, on an emergency basis, was necessary. The judge was aware of the "strong disapproval" embodied in the Ervin Act for converting voluntary mental health patients to involuntary patients, but still was persuaded that Peterson came within the exception recognized by our

cases because of his demonstrated instability, the immediate danger he posed as a result of his illness, and the fact that he was no longer amenable to treatment. The fact, of course, that St. Elizabeths Hospital subsequently converted him to a voluntary patient does not weaken the conclusion the judge fairly reached on the evidence before her.

### III. Conclusion

Because Peterson posed an immediate danger to himself or others and was no longer amenable to voluntary inpatient treatment at the time, the decision to transfer him to St. Elizabeths as an involuntary inpatient under the emergency hospitalization procedures provided for in the Ervin Act, D.C.Code § 21–521, was permissible. Accordingly, the trial court's decision is

*Affirmed.*

---

**6.** We recognize that the refusal to take medication "is not a basis in and of itself" for emergency involuntary hospitalization pursuant to D.C.Code § 21–521. *See In re Stokes*, 546 A.2d 356, 364 (D.C.1988). In a case such as this one, however, where appellant's refusal to take medication was coupled with dangerousness to himself and others, involuntary hospitalization pursuant to D.C.Code § 21–

521 was warranted. Clearly, this determination requires fact-specific analysis of the individual circumstances in each case.

**7.** CPEP, located at the D.C. General Hospital Compound, provides around-the-clock psychiatric services for adults experiencing a psychiatric crisis.