the arbitrator's Stage Two decision rejecting Mr. Wolf's request for an additional fee award in the approximate amount of $110,000.

■ Whether Mr. Hughes was right or wrong in his reasoning is not a basis on which we may reject his arbitration award, because "[i]t is not enough to show that the [arbitrator] committed an error—or even a serious error," *Oxford Health Plans LLC, supra*, 133 S.Ct. at 2068, and "[we] will not set aside an arbitration award for errors of either law or fact made by the arbitrator." *Bolton, supra*, 954 A.2d at 959 (internal quotation marks and citation omitted). Moreover, on this record we cannot conclude that the arbitrator's Stage One and Stage Two decisions are based solely on his own "conception of sound policy," or solely on "[his] own notions of [economic] justice." *Oxford Health Plans LLC, supra*, 133 S.Ct. at 2068, 2070 (citations omitted). In sum, the record surely does not permit us to hold that Mr. Hughes "stray[ed] from interpretation and application of [the agreement and amended agreement]" such that his "decision [is] unenforceable." *Stolt–Nielsen, supra*, 130 S.Ct. at 1767. "Because the parties 'bargained for the arbitrator's construction of their agreement[s],'" and because the arbitrator's decision "arguably constru[ed] or appl[ied] the contract[s]," those decisions "must stand, regardless of a court's view of [their] (de)merits." *Oxford Health Plans LLC*, 133 S.Ct. at 2068 (citations omitted).

*So ordered.*

In re D.F., Appellant.

No. 11–FS–1543.

District of Columbia Court of Appeals.

Submitted Feb. 12, 2013.
Decided July 11, 2013.

Joel R. Davidson was on the brief for appellant.

Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Rosalyn Calbert Groce, Deputy Solicitor General, and John J. Woykovsky, Assistant Attorney General, were on the brief for appellee District of Columbia.

Before FISHER and THOMPSON, Associate Judges, and WAGNER, Senior Judge.

THOMPSON, Associate Judge:

After a bench proceeding, the Superior Court found that then thirteen-year-old D.F. possessed a BB gun [1] outside a building, in violation of 24 DCMR § 2301.3.[2] In this appeal, D.F. contends that the court "erred in finding that [his] possession of an inoperable BB Gun supported a conviction for possession of a BB Gun outside the home." We disagree and therefore affirm.

## I. Background

The following evidence was presented at the evidentiary hearing: On August 16, 2011, Metropolitan Police Department Officer Filio Simic received a radio run for a man with a gun in the 700 block of Bailey Place, S.E., and a description of two individuals. After canvassing the area, Officer Simic located individuals on bicycles who matched the description. When Officer Simic approached the individuals, one of them—appellant—made a turn on his bike and started pedaling away. When Officer Simic caught up with appellant, appellant said, without Officer Simic having spoken to him, "[i]t's just a BB gun. It's just a BB gun." Appellant told the officer that the gun was "in his waistband, in his pants."

Officer Simic recovered the gun, which he described as "a black, 6–mm BB gun, P–Ruger 345." The gun looked like a "real" semi-automatic pistol and was "extremely similar" to the officer's own Glock weapon. The gun had the letters "BB" on it, but the "orange or yellow or . . . kind of bright color cap [found] on the top of" BB guns had been "taken off the tip of the airway of the gun" (in Officer Simic's view,

---

1. In this opinion, we use the terms "BB gun" and "B–B gun" interchangeably.

2. Section 2301.3 provides that "[i]t shall not be lawful for any person to carry or have in his or her possession outside any building in the District an air rifle, air gun, air pistol, B– B gun, spring gun, blowgun, bowgun, or any similar type gun." It represents the recodification of a longstanding rule that previously was part of Article IX, § 4(b) of the Police Regulations of the District of Columbia.

"because otherwise people would know right away it was a BB gun and not a real thing"). Asked to describe the condition of the gun, Officer Simic said that there was "damage done" to the gun and that a shoelace was "wrapped around the handle" of the gun, "I guess to make it look more real and to cover [the] hole the cartridge would go in." One side of the gun was "completely covered by black duct tape." There were no BB's in the gun, it had "no interior barrel," and Officer Simic testified that the gun "failed to test fire, due to missing parts."

On cross-examination, Officer Simic testified that "the sides of the compartment where the $CO_2$ cartridge would be" and "a magazine to hold BB's" were missing. He had acknowledged on direct examination, however, that he was "[n]ot really" familiar with BB guns with $CO_2$ cartridges, and, although he had recovered about a dozen BB guns since he had been on the police force, he could not recall having recovered any that had cartridges. Officer Simic agreed that "[b]ased on [his] experience [i]n recovering guns," the item he recovered from appellant was "a BB gun."

In urging the court to grant D.F.'s motion for judgment of acquittal, D.F.'s counsel told the court that section 2301.3 contemplated "operability," i.e., a "device capable of expelling a projectile or expelling a missile." Counsel further argued

that what was before the court was "not actually a BB gun, but was instead the frame of a BB gun" and that the item was "missing several parts that are completely necessary for it to function at all." He emphasized that the item had "no barrel," "no capability to hold the propellant[,] and no capability to hold the items that are actually propelled" and "doesn't constitute a whole BB gun anymore [sic] than just the barrel would constitute a BB gun or just the cartridge that would be inserted into it would be considered a BB gun." In closing argument, counsel added that the "frame of the gun is essentially . . . a toy gun" and reiterated that the regulation should be interpreted "as contemplating an operational BB gun as the definition of a BB gun."

The court credited Officer Simic's testimony and, in finding that D.F. committed the offense of possession of a BB gun outside a building, reasoned that "operability is not an issue for . . . possession of a BB gun." The court explained that it believed that the term "BB gun" should be construed like the term "[f]irearm" in D.C.Code § 22–4501(2A) (2001) to include any such weapon, "regardless of operability."[3]

On appeal, D.F. has not renewed his argument that the item Officer Simic recovered was not a BB gun.[4] Instead, he

---

**3.** As amended in 2009 by the "Inoperable Pistol Amendment Act of 2008" (the "Act"), D.C.Code § 22–4501(2A) (2011 Supp.) provides that " '[f]irearm' means any weapon, *regardless of operability*, which will, or is designed or redesigned, made or remade, readily converted, restored, or repaired, or is intended to, expel a projectile or projectiles by the action of an explosive" (italics added). *See* D.C. Law 17–388, § 2(a), 56 D.C.Reg. 1162, 1162–63 (2009).

**4.** Even if the issue were properly before us, we would likely find it difficult to rule in D.F.'s favor. One reason is that the record

before us is equivocal about whether the recovered item required a $CO_2$ cartridge to be complete, and thus is less than clear about the extent of the item's missing parts. In addition, D.F. did not ask the court to make a special finding about the extent of the missing components (and the court did not make such a finding). *See Tyson v. United States*, 30 A.3d 804, 806 (D.C.2011) (noting that, in a bench trial, "the Court shall make a general finding and shall in addition, on request made before the general finding, find the facts specially" (quoting Super. Ct.Crim. R. 23(c)), and stating that when a "request for special findings

urges us to hold that the evidence that he carried an inoperable BB gun means that the District of Columbia's evidence was insufficient as a matter of law to support a finding that he committed the charged offense. Stated differently, D.F. urges us to read an operability requirement into the 24 DCMR § 2301.3 prohibition against "carry[ing] or hav[ing] in [one's] possession a[ ] ... B–B gun[.]" We decline to do so, for the reasons we describe below.[5]

## II. Discussion

■ Several general principles of statutory (and regulatory) construction guide our analysis. "The primary and general rule of statutory [or regulatory] construction is that the intent of the lawmaker is to be found in the language that he has used." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C.1983) (en banc); *see also Brownlee v. District of Columbia Dep't of Health*, 978 A.2d 1244, 1249 n. 8 (D.C.2009) ("Statutory or regulatory construction begins with the plain language of the statute or regulation.") (internal quotation marks and alterations omitted). "[I]t is axiomatic that 'the words of the [regulation] ... be construed according to their ordinary sense and with the meaning commonly attributed to them.'" *Peoples Drug*, 470 A.2d at 753 (quoting *Davis v. United States*, 397 A.2d 951, 956 (D.C.1979)) (alterations omitted).

"When the plain meaning of the [regulatory] language is unambiguous, the intent of the legislature is clear, and judicial inquiry need go no further." *District of Columbia v. Gallagher*, 734 A.2d 1087, 1091 (D.C. 1999) (internal quotation marks omitted); *see also Tendler v. District of Columbia*, 50 A.2d 263, 264 (D.C.1946) ("Neither the trial court nor we are entitled to construe a regulation beyond its plain meaning.").

■ Nevertheless, "[a] court may refuse to adhere strictly to the plain language of a statute in order to effectuate the legislative purpose as determined by a reading of the legislative history or by an examination of the statute as a whole." *District of Columbia v. Edison Place*, 892 A.2d 1108, 1111 (D.C.2006) (internal quotation marks and alterations omitted) (stating also that in interpreting statute, courts "must not 'make a fetish out of plain meaning' nor should they 'make a fortress out of the dictionary' "). Statutory interpretation, we have recognized, is "a holistic endeavor, ... in which we must consider not only the bare meaning of [words] but also [their] placement and purpose in the statutory scheme." *District of Columbia Appleseed Ctr. for Law & Justice, Inc. v. District of Columbia Dep't of Ins., Sec. & Banking*, 54 A.3d 1188, 1213 (D.C.2012) (internal quotation marks omitted). "The literal words of a statute ... are not the sole index to legislative intent, but rather, are

---

is not timely made, the right to such findings is generally regarded as having been waived") (internal quotation marks omitted); *see also* U.S. Sentencing Guidelines Manual § 1B1.1 cmt. n. 1 (G) (referring to a "BB gun" as a weapon that uses "air *or* carbon dioxide pressure" to expel a projectile) (emphasis added); *cf. Kingsbur v. Commonwealth*, 267 Va. 348, 593 S.E.2d 208, 209–10 (2004) (confirming that in "exceptional circumstances," which do not include "simply a showing of disrepair that might preclude expelling a projectile by explosion at a particular point in time," "an instrument originally designed, made, and intended to expel a projectile by force of an

explosion can lose this characteristic in many ways such that it would no longer be fairly considered a firearm") (internal quotation marks omitted); *Sprouse v. Commonwealth*, 2005 WL 283266, *1, 2005 Va.App. LEXIS 59, *3 (Va.Ct.App. Feb. 8, 2005) (stating that "[w]hether such a transformation [as *Kingsbur* describes] has taken place ... is a 'question of fact for the fact finder.' ").

5. As this is an issue of regulatory interpretation, our review is *de novo. See In re Greenspan*, 910 A.2d 324, 335 (D.C.2006).

to be read in light of the statute taken as a whole," with the goal of interpreting the statute "as a harmonious whole." *Id.* (internal quotation marks and citations omitted). We also recognize that " '[i]f divers statutes relate to the same thing, they ought to be taken into consideration in construing any one of them[.]' " *Doctors Council of the District of Columbia Gen. Hosp. v. District of Columbia Pub. Emp. Relations Bd.*, 914 A.2d 682, 695 (D.C. 2007).

In this case, there can be no dispute that the plain language of 24 DCMR § 2301.3 states simply that "[i]t [is] ... [un]lawful for any person to carry or have in his or her possession outside any building in the District an air rifle, air gun, air pistol, B–B gun, spring gun, blowgun, bowgun, or any similar type gun[,]" without any reference to operability. D.F. argues, however, that we should imply a requirement that a BB gun be operable to support a conviction under § 2301.3 in the same way that we have previously read an operability requirement into some other weapon-possession provisions that similarly make no mention of operability.[6] D.F. recognizes that, through the Act, the Council of the District of Columbia has legislatively overridden our holdings in these cases by amending the pertinent statutes to state expressly that operability is not required, but he argues that the Council's failure to

add such language to § 2301.3 should be taken to signify that § 2301.3 is properly interpreted to require operability. We are not persuaded by D.F.'s argument.

In some of the cases on which D.F. relies, this court was interpreting statutes that contained no definition of the pertinent statutory terms, and we therefore relied on the ordinary meaning of the terms or on definitions found elsewhere in the D.C.Code. In *Washington*, for example, we construed the prohibition in D.C.Code § 22–3214 (1981) ("no person shall within the District of Columbia possess any ... sawed-off shotgun") to reach only such items as were operable. *See* 498 A.2d at 248–49. We did so because (1) the statute at the time did not define "shotgun," (2) we sought therefore to construe the term "according to [its] ordinary sense," (3) we found definitions referring to a shotgun as a type of "firearm," and (4) we relied on a definition found elsewhere in the D.C.Code defining a "firearm" as a "weapon which *will ... expel a projectile* ... by the action of an explosive" (emphasis added). *See id.; see also Lee*, 402 A.2d at 841 (reasoning that although D.C.Code § 22–3204 (1981), which prohibited carrying a pistol without a license, did not expressly refer to "operability," proof of "operability" was required since a "pistol" was defined in D.C.Code § 22–3201 (1981) as a "firearm," and since "[a] firearm is by

---

**6.** *See, e.g., Moore v. United States*, 927 A.2d 1040, 1060 (D.C.2007) ("[P]ossession of a machine gun is not a violation of § 22–3214(a) unless the weapon is operable[.]"); *Turner v. United States*, 684 A.2d 313, 315 n. 4 (D.C. 1996) (stating that the government had to "prove the operability of the machine gun to convict under" the statute prohibiting the possession of machine guns); *Washington v. United States*, 498 A.2d 247, 249 (D.C.1985) (holding that a conviction under D.C.Code § 22–3214 (1981), which prohibited possession of any sawed-off shotgun, could not stand without proof of operability); *Curtice v.*

*United States*, 488 A.2d 917, 918 (D.C.1985) (reversing a conviction for carrying a pistol without a license because the government failed to prove that the pistol was operable); *Lee v. United States*, 402 A.2d 840, 841 (D.C. 1979) (holding that proof of "operability" was required for a conviction under D.C.Code § 22–3204 (1981), which prohibited carrying a pistol without a license); *Anderson v. United States*, 326 A.2d 807, 811 (D.C.1974) ("When a defendant is charged with carrying a pistol without a license, the government must prove that the weapon was operable.").

common usage a device capable of propelling a projectile by explosive force"). If we were to follow a similar approach here, we would likely conclude that proof of a violation of § 2301.3 requires proof of an operable BB gun, because the dictionary definition of a BB gun is "[a] small air rifle that shoots BB's."[7] However, we reject this approach for at least two reasons.

First, as reflected in the "regardless of operability" language in D.C.Code § 22–4501 on which the Superior Court relied as guidance, our legislature has rejected the approach of our case law implying "operability" as a requirement for conviction. Through the Act, the Council added the "regardless of operability" language to definitional sections (including D.C.Code §§ 22–4501 and 7–2501.01) that support several statutory provisions, including the statutes prohibiting carrying a dangerous weapon (D.C.Code § 22–4504(a)), carrying a pistol outside the home or business possession of a firearm during a crime of violence or dangerous crime (D.C.Code § 22–4504(b)), and carrying any of a variety of specified types of guns (D.C.Code § 22–4514(a)). The Council took corrective action specifically because "[f]or years the courts have required proof that a firearm is operable as a matter of law, even though the statute is silent as to operability and for many decades operability had not been required as an element of the offense." Committee on Pub. Safety and the Judiciary, Report on Bill 17–593 at 1 (Nov. 25, 2008).

It is true, as D.F. emphasizes, that the Council did not amend 24 DCMR § 2301.3 when it amended several other provisions of law through the Act. However, this court had never construed § 2301.3 to include an operability requirement. For that reason, we decline to give the significance D.F. urges to the fact that the Council omitted from the Act any amendment to § 2301.3 to specify "regardless of operability." On the other hand, we do take the Council's action in amending the affected provisions as a cautionary note about reading into any weapons-possession provision an operability requirement that the plain language does not specify.

Second, rather than "make a fortress out of the dictionary," we are obliged to consider 24 DCMR § 2301 as a whole. In that regard, we note that while § 2301.1 prohibits a juvenile (a "person under the age of eighteen") from carrying or having in his or her possession "any gun ... or other dangerous weapon of any character" "upon any street, avenue, road, alley, park, or other public space," § 2301.3 prohibits any person from carrying or having a BB gun "outside any building" in the District of Columbia (except that, under § 2301.4, an adult is not prohibited from transporting a BB gun if it is both "unloaded and securely wrapped"). The focus of § 2301.1 seems to be on the actual danger to the public presented by weapons in the hands of a juvenile (and, we think, an operability requirement might reasonably be implied in the absence of evidence of a contrary legislative intent[8]). By contrast, the focus of §§ 2301.3 and 2301.4 is on having a BB gun (or any of the other listed items) *outside*, where it can be seen by the gener-

---

7. *See* The American Heritage Dictionary of the English Language 159 (3d ed.1992).

8. *Cf. Strong v. United States,* 581 A.2d 383, 389 (D.C.1990) (reversing a conviction for carrying a dangerous weapon because an inoperable air pistol was not a dangerous weapon under D.C.Code § 22–3204 (1981)); *see also Wright v. United States,* 926 A.2d 1151, 1155, 1155 n. 3 (D.C.2007) (recognizing that an unloaded, sawed-off shotgun is an inherently dangerous weapon, but implying that operability was still required for a conviction of carrying a dangerous weapon under D.C.Code 22–4504(a)(1) (2001)).

al public (hence, § 2301.4's requirement that a BB gun be transported only while "securely wrapped"). The intent of the latter two provisions, we think it reasonable to infer, is to ban the carrying of a BB gun where it may frighten others because it *appears* to be dangerous.[9] *Cf. Evans–Reid v. District of Columbia*, 930 A.2d 930, 939 n. 10 (D.C.2007) (referring to a BB gun as "unlikely to inflict serious injury" and "relatively inoffensive"); *Tendler*, 50 A.2d at 263 (referring to an air pistol as "a dangerous-appearing weapon"). If that is the intent of § 2301.3 (we know of no legislative history that elucidates the matter), whether a BB gun carried outside a building is operable is irrelevant, and the facts that D.F.'s BB gun looked like a real semi-automatic pistol, was "extremely similar" to Officer Simic's Glock, and apparently led to the report of a "man with a gun," put D.F.'s carrying of the gun squarely within the scope of the regulation.[10]

### III. Conclusion

■ We hold that carrying or possessing a BB gun outside a building in the District of Columbia violates 24 DCMR § 2301.3 without regard to whether the

BB gun is operable. Wherefore, the judgment of the Superior Court is

*Affirmed.*

---

9. *Cf. Townsend v. United States*, 559 A.2d 1319, 1321, 1321 n. 4 (D.C.1989) (explaining the court's different conclusions about whether operability was a requirement under two statutes by reference to "the obvious purpose of [D.C.Code] § 22–3204 [1981] to prohibit the carrying of weapons that are in fact dangerous, which differs from the broader purpose of [D.C.Code] § 6–2311 [1981]" to address both health and safety).

10. The District also directs our attention to D.C.Code § 7–2501.01 (2001), which includes within the definition of "destructive device" "[a]ny device by whatever name known which will, or is designed or redesigned, or may be readily converted or restored to expel a projectile by the action of an explosive or other propellant through a smooth bore barrel, except a shotgun[,]" § 7–2501.01(7)(B), but es-

tablishes an exception for "[a]ny pneumatic, spring, or B–B gun which expels a single projectile not exceeding .18 inch in diameter[.]" § 7–2501.01(7)(E)(i). The District argues that it would be anomalous to treat all inoperable BB guns as falling outside § 2301.3 (which carries a maximum penalty of $300 pursuant to 24 DCMR § 100.6), when, the District asserts, a gun like D.F.'s, which was originally designed to expel 6 millimeter pellets (i.e., pellets measuring about .23 inch in diameter), is not excluded from the definition of "destructive device" in § 7–2501.1 (possession of which carries a penalty of a fine of not more than $1,000 and/or imprisonment for not more than 1 year). *See* D.C.Code §§ 7–2502.01 and –2507.06 (2001). We need not reach this argument.