# District of Columbia
# Court of Appeals

**No. 15-CO-531**

IN RE GRAND JURY WITNESS G.B.;
    G.B.,



FILED

MAY **26** 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

                      Appellant,

    v.                          **CRW-102-16**

UNITED STATES,

                      Appellee.


On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: THOMPSON and EASTERLY, *Associate Judges*; and NEBEKER, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of the Superior Court is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: May 26, 2016.

Opinion by Associate Judge Phyllis D. Thompson.

Concurring opinion by Senior Judge Frank Q. Nebeker.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CO-531

IN RE GRAND JURY WITNESS G.B.;
G.B., APPELLANT.

FILED   5/26/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CRW-102-15)

(Hon. Melvin R. Wright, Motions Judge)

(Argued December 16, 2015                    Decided May 26, 2016)

*Murad Hussain*, with whom *Mary C. Kennedy*, *John St. Leger*, and *Joanna G. Persio* were on the brief, for appellant.

*Karen P. Seifert*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Christine Macey*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and NEBEKER, *Senior Judge*.

Opinion for the court by *Associate Judge* THOMPSON.

Concurring opinion by *Senior Judge* NEBEKER at page 31.

THOMPSON, *Associate Judge*:   In this appeal, appellant G.B., the victim of

and witness to a stabbing, asks us to hold that "no valid investigative warrant may

issue to forcibly take the DNA of a witness who is not suspected of the crime for

which the DNA is sought." We hold instead that, pursuant to Superior Court Rule of Criminal Procedure 41 and consistent with the Fourth Amendment, a search warrant may issue authorizing the government's proposed buccal swab search (and incidental seizure) of G.B. for the purpose of collecting his DNA.

## I. Factual Background

According to the *Gerstein* affidavit and a search warrant application filed in *United States v. Kelly Hughes*, No. 2014-CF3-014232, on August 2, 2014, G.B., suffering from two apparent stab wounds in his arm, went to a fire station to seek medical attention. Police officers responding to the fire station, and later to the hospital to which G.B. was transported, interviewed G.B. G.B. gave them the address of the apartment where the stabbing occurred and told them that his assailant was "Margaret Jones." Jones, G.B. told the officers, was an occasional sexual partner who had cut him with a butcher's knife after discovering that he had slept with another woman.[1] G.B. also told the police officers that he did not "want to do anything about being stabbed." The police went to the apartment building, where they found blood droplets on the "entrance floor molding" and in the

---

[1] G.B. did not provide any identifying information to enable police to find the purported perpetrator, "Margaret Jones," and the police were unable to locate a person by that name.

hallway between apartments #1 and #2. They also found a bloody doormat in a nearby trash can. They spoke to an individual at the scene ("W1"), who told them that he was inside G.B.'s apartment when he saw a woman named Kelly Hughes, who had been arguing with G.B., slash at G.B. with a kitchen knife and, before leaving the apartment, attempt to clean up G.B.'s blood. On August 11, 2014, officers searched Hughes's rental vehicle pursuant to a search warrant and found blood on the side of the driver's seat.

The government convened a grand jury and sought an indictment against Hughes.[2] In conjunction with the government's efforts to prosecute Hughes, the government asked G.B. to voluntarily give a saliva sample (from which could be extracted a sample of his DNA). After G.B. declined to do so, the government applied for a search warrant to take a sample by the buccal swab method.[3] The affidavit in support of the search warrant application averred that the swab would "be submitted for DNA analysis to determine whether the source of the blood" in Hughes's rental vehicle is G.B. The Honorable Henry F. Greene issued the search

---

[2] On January 16, 2015, G.B. testified before the grand jury that Margaret Jones was his assailant.

[3] The buccal swab procedure entails "[a] gentle rub along the inside of the cheek[.]" *Maryland v. King*, 133 S. Ct. 1958, 1979 (2013).

warrant after determining that probable cause existed to believe that "on the person of [G.B.] . . . there is now being concealed evidence, namely the victim's cheek cells/saliva (buccal swab)[.]"

G.B. filed a motion to quash the warrant, emphasizing his status as a victim and arguing that a search warrant authorizing the government to forcibly take a buccal swab sample to extract DNA from a crime victim is invalid. On January 22, 2015, the Honorable Melvin Wright denied G.B.'s (first) motion to quash. By that time, the warrant had actually expired by its own terms because more than ten days had passed since its issuance. The government indicated, however, that it would seek another warrant.[4] On March 3, 2015, G.B. filed a motion to quash any search warrant authorizing the government to take a buccal swab and to preclude the government from applying for any future warrant for his DNA. After a hearing on April 21, 2015, Judge Wright found that there was probable cause to issue the search warrant for G.B.'s DNA and denied G.B.'s renewed motion, but restricted the use of any DNA extracted pursuant to warrant to the case against Hughes.[5]

---

[4] The Honorable Susan Winfield issued another search warrant for G.B.'s saliva on March 13, 2015. The government unsuccessfully attempted to execute the warrant "multiple times" before it expired at the end of the ten-day time limit.

[5] Specifically, Judge Wright's April 21, 2015, ruling from the bench and his May 4, 2015, written order prohibited the government from entering G.B.'s

(continued…)

G.B. noticed this appeal from Judge Wright's ruling, and the government agreed not to seek a new warrant pending the outcome of appellate review. Accordingly, the current posture of this case is that the government still intends to apply for a warrant to obtain G.B.'s DNA. G.B. asks this court to rule that the Superior Court erroneously denied his motion to quash and that "no warrant . . . may issue for the suspicionless, forcible extraction of DNA from the non-party victim of a crime."

G.B.'s briefs on appeal advance three primary arguments: (1) that Superior Court Rule of Criminal Procedure 41 (b), which describes the limited circumstances in which the Superior Court may issue a warrant, provides no authority for a warrant — or for the seizure of the person that is necessary to execute the warrant — to obtain the DNA of a victim who is not suspected of a crime[6]; (2) that the seizure of his person that would be entailed in taking a buccal

---

(…continued)
DNA into any database, from using the DNA in any future matter, and from using the DNA evidence to prosecute G.B. for perjury. The orders also required the government to destroy any remaining DNA samples at the conclusion of the case against Hughes.

[6] G.B. asserts that this not only is an issue of first impression in this jurisdiction, but would be so elsewhere as well. According to his brief, "no
(continued…)

swab would be an arrest, which would be invalid because there has been no finding of "probable cause" to believe he is guilty of a criminal offense; and (3) that under a test balancing his interest in privacy against the government's law enforcement needs, forcibly taking a sample of his saliva would be an unreasonable intrusion in violation of his Fourth Amendment rights. For the reasons discussed below, we disagree. Accordingly, given the specific facts of this case, we affirm the judgment of the Superior Court.

## II. Jurisdiction

We begin by addressing the issue of our jurisdiction to hear this appeal. As the government's brief points out, an order denying a motion to quash a search warrant generally is not a final decision for the purposes of appeal.[7] *See In re Solomon*, 465 F.3d 114, 122 (3rd Cir. 2006) (holding that the court was without jurisdiction to entertain a defendant's interlocutory appeal of the denial of a motion

---

(…continued)
published decision in any jurisdiction appears to have addressed an effort to obtain a[n ex parte] warrant for a non-suspect victim's DNA."

[7] The government states that it does not contest our jurisdiction over this appeal.

to quash a warrant for the defendant's blood and saliva).[8]  However, where the denial of a motion to quash implicates a third party to the litigation, courts have recognized an exception to the rule precluding interlocutory appeal.  *See, e.g.*, *In re Grand Jury Subpoenas*, 926 F.2d 847, 854 (9th Cir. 1991) (explaining that an immediate appeal from an order denying a motion to quash may be allowed where that is "[t]he only way to assure [the movant] that his interests will be protected"); *see also United States v. Hess*, 982 F.2d 181, 184-85 (6th Cir. 1992) (court of appeals had jurisdiction over appeal from denial of motion for return of documents, where motion was brought by movants who were "strangers to the criminal case"; motion was properly treated as independent proceeding and order denying motion was reviewable as final order) (citing *DiBella v. United States*, 369 U.S. 121, 131-32 (1962) (motion for return of property is independent, permitting appellate review, "if the motion is solely for return of property and is in no way tied to a criminal prosecution *in esse* against the movant")).  In this case, G.B.'s motion was "completely collateral" to the case against Hughes because (1) Judge Wright's order fully disposed of G.B.'s challenge and (2) G.B.'s right to be free from search

---

[8]  As the *Solomon* court explained, "[t]he denial of Solomon's motion to quash the search warrant . . . will not be 'effectively unreviewable' in the absence of interlocutory consideration[,]" because "he may move to suppress the evidence. . . . If that motion is denied, and if Solomon is convicted, the denial of the motion to suppress may then be asserted as a ground for appeal from the final judgment." 465 F.3d at 122.

would be irretrievably lost if he were forced to submit to a search while awaiting resolution of Hughes's case. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Whether we analogize to cases examining the right to an immediate appeal from a denial of a motion to quash a subpoena and applying the collateral order doctrine, or, instead, analogize to cases holding that the denial of a third-party's motion for return of property is a final order that may be appealed immediately, the analysis weighs in favor of our exercising jurisdiction. And, while there is no live search warrant for G.B.'s DNA, the government has signaled its intent to apply for another. If the government obtains another warrant (with a ten-day life), G.B. would likely have to submit to the forcible taking of his DNA before being able to obtain appellate review. Thus, the circumstance occasioning his appeal is capable of repetition but evading review. *See Weinstein v. Bradford*, 423 U.S. 147, 148-49 (1975) (explaining that the "capable of repetition, yet evading review" doctrine was first articulated in a case where "because of the short duration of the . . . order challenged, it was virtually impossible to litigate the validity of the order prior to its expiration" by its own terms, and where "the same party would in all probability be subject to the same kind of order in the future"); *In re Johnson*, 691 A.2d 628, 631 (D.C. 1997) (citing *Weinstein*). Given all these considerations, we conclude that we may exercise jurisdiction.

## III.  Rule 41 (b)

## A. Evidence of the Commission of a Criminal Offense

Citing the constitutional avoidance doctrine, G.B. argues that we need not reach the issue of whether issuance of the warrant to collect a sample of his DNA contravenes the Fourth Amendment.  He urges us instead to resolve this appeal on the basis of his argument that there is no authority to issue a warrant for the proposed search under Super. Ct. Crim. R. 41 (b).[9]  "As this is an issue of regulatory interpretation, our review is de novo." *In re D.F.*, 70 A.3d 240, 243 n.5 (D.C. 2013).

---

[9]    Referring to the Federal Rules of Criminal Procedure counterpart to Super. Ct. Crim. R. 41, federal courts have observed that "[t]he purpose of Rule 41 is to carry out the mandate of the [F]ourth [A]mendment." *Navarro v. United States*, 400 F.2d 315, 318-19 (5th Cir. 1968), *overruled on other grounds by United States v. McKeever*, 905 F.2d 829 (5th Cir. 1990); *United States v. Haywood*, 464 F.2d 756, 760 (D.C. Cir. 1972).  They have also recognized, however, that the standards set out in Fed. R. Crim. P. 41 "are not coextensive with the Amendment. Rather they are more specific, and, therefore, more stringent[.]" *Haywood*, 464 F.2d at 760 (discussing Rule 41 (a)).  Therefore, the federal courts' "[a]uthority to issue warrants exists only insofar as granted by the rules, and no further." *Navarro*, 400 F.2d at 319.  We assume without deciding that the same limitation applies with respect to Super. Ct. Crim. R. 41, since it "was intended to be a counterpart to" Fed. R. Crim. P. 41. *Gooding v. United States*, 416 U.S. 430, 452-53 (1974).

Rule 41 (b) provides in pertinent part that

> A warrant may be issued . . . to search for and seize any (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense; or (4) person for whose arrest there is probable cause, or who is unlawfully restrained.

Super. Ct. Crim. R. 41 (b)(1)-(4).[10] G.B. argues that his DNA is none of the items enumerated in the rule. For its part, the government does not contend that G.B.'s DNA is contraband, or the fruit of a crime, or something otherwise criminally possessed; or that it is or was the means of committing a criminal offense; or (leaving aside the government's allegation that G.B.'s DNA may support prosecuting him for perjury about the identity of his assailant) that G.B. is a person for whose arrest there is probable cause. Rather, the government's contention is that G.B.'s DNA is "evidence of the commission of a criminal offense" within the meaning of Rule 41. G.B. argues that rather than evidence of a crime, his DNA is simply evidence that might lead to other evidence (i.e., a DNA match to the blood

---

[10] *See also* D.C. Code § 23-521 (b)(4) (2012 Repl.) ("A search warrant may direct a search of . . . designated persons."); *Irving v. United States*, 673 A.2d 1284, 1287 (D.C. 1996) ("Property is subject to seizure pursuant to a search warrant if there is probable cause to believe it is either the intended instrumentality of a crime or constitutes evidence of a crime or the identity of one participating in a crime." (citing D.C. Code § 23-521 (d)(3)-(4) (1989))).

found in Hughes's rental vehicle) that "might in turn bolster the credibility of the

. . . purported witness to the assault[.]" G.B. argues that "[s]uch attenuated logic"

does not bring the warrant sought by the government within the authority of Rule

41.[11]

---

[11] Emphasizing that Rule 41 (b)(1) authorizes the search and seizure of "property," G.B. further suggests that it is arguable whether DNA (or, to be more precise, a saliva sample containing it) is "property" within the meaning of the Rule. We are satisfied that a saliva sample falls within the scope of the Rule. Super. Ct. Crim. R. 41 (h) provides that "[t]he term 'property' is used in this Rule to include documents, books, papers and any other tangible objects." Super. Ct. Crim. R. 41 (h). Although this court has not previously considered whether saliva is a "tangible object" within the meaning of Rule 41, at least one federal appellate court has interpreted the term in the counterpart federal rule (Fed. R. Crim. P. 41 (a)(2)(A)) to include bodily fluids such as blood and urine. *See United States v. Kriesel*, 720 F.3d 1137, 1144, 1145 (9th Cir. 2013) (stating that "[t]he applicability of Rule 41 to bodily fluids is supported by our circuit law[,]" and holding that the district court "properly concluded that the blood sample itself is a tangible object" and that the defendant seeking to have the sample returned to him was "seeking the return of 'property'"); *cf. United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1173 (9th Cir. 2010) (en banc) (holding that urine samples are "property" within the meaning of Fed. R. Crim. P. 41 (g)); *see also, e.g.*, *State v. Little*, 431 P.2d 810, 815 (Or. 1967) (en banc) (concluding that blood and saliva are tangible "objects"). We similarly conclude that the saliva or buccal cells that would be collected through a buccal swab are "tangible objects" and thus "property" within the meaning of Super. Ct. Crim. R. 41.

Although we need not address the issue further here, we also note that, as discussed in *Warden v. Hayden*, 387 U.S. 294 (1967), courts have moved away from a property-rights conception of Fourth Amendment protections to a privacy-rights conception. *See id.* at 304 ("We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts."). While Rule 41 uses the words "property" and "tangible objects" (language that *Navarro* tells us was taken almost verbatim from a 1917 statute, *see*

(continued…)

We have little trouble concluding that the government has the better of the argument about what it means to "constitute[] evidence of the commission of a criminal offense" within the meaning of Rule 41 (b). Although G.B. is correct that, standing alone, his DNA is "not evidence of a crime's commission," his approach is not one that courts have taken in construing the term "evidence of a crime." As described in note 9 *supra*, "[t]he purpose of Rule 41 is to carry out the mandate of the [F]ourth [A]mendment." *Navarro*, 400 F.2d at 318. Rule 41 (b) therefore is properly construed to reflect a recognition that under the Fourth Amendment, "[t]here must, of course, be a nexus — automatically provided in the case of fruits, instrumentalities or contraband — between the item to be seized and criminal behavior." *Hayden*, 387 U.S. at 307. "[I]n the case of 'mere evidence'" of a criminal offense, the relevant question is whether there is "cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Id.*; *see also Bill v. Brewer*, 799 F.3d 1295, 1301, 1302 (9th Cir. 2015) (applying the rule established by *Hayden* to conclude that a warrant had properly issued for "DNA samples [to be seized by mouth swab] . . . from all public safety personnel

---

(…continued)

400 F.2d at 318 n. 2), it almost certainly is time to interpret those term through a privacy-rights lens, to achieve the Rule's purpose of "carry[ing] out the mandate of the [F]ourth [A]mendment." *Navarro*, 400 F.2d at 318.

who entered the crime scene to exclude them as depositors of the questioned DNA[,]" where the DNA samples would aid in the conviction of an eventual criminal defendant by negating any contention that police had contaminated the relevant evidence). There is no reason to think that the drafters of Rule 41 had in mind the much more cramped notion of "evidence of a criminal offense" G.B. advocates. We conclude that Rule 41 (b)'s reference to "evidence of the commission of a criminal offense" includes within its scope "evidence that might lead to other evidence." Further, our case law establishes that if there is reason to believe that the evidence sought will aid in apprehending or convicting a criminal, a warrant to obtain it may properly issue, even if it is expected that the evidence will be corroborative of evidence law enforcement officials already have. *See Rutledge v. United States*, 283 A.2d 213, 215-16 (D.C. 1971) (holding that a warrant was properly issued to search for hashish in appellant's apartment because the presence of the drug would corroborate an informant's testimony that appellant was an "illegal transferor of that narcotic," notwithstanding appellant's objection that "the presence of hashish in his apartment would not prove that he had transferred it in the past or that he was selling it when the warrant was executed").

## B. The Seizure of the Person Necessary for the Search

G.B. next argues that even if DNA is property, Rule 41 (b)(1) authorizes the search and seizure of property "without authorizing the antecedent seizure of a person necessary to effect a body search."[12]  However, to repeat, "[t]he purpose of Rule 41 is to carry out the mandate of the [F]ourth [A]mendment." *Navarro*, 400 F.2d at 318.  Accordingly, analogizing to cases holding that the Fourth Amendment permits warrantless seizures of persons incident to authorized searches, we conclude (as discussed below) that the Superior Court's issuance of a warrant authorizing a buccal swab (and the concomitant "seizure") of G.B. would not exceed the court's authority under Rule 41.

G.B. relies on the Supreme Court's statement in *United States v. Dionisio*, 410 U.S. 1 (1973), that "the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels — the 'seizure' of the 'person' necessary to bring him into contact with government agents, and the subsequent search for and seizure of the evidence." *Id.* at 8 (citing *Schmerber v. California*, 389 U.S. 757, 767 (1966)) (additional citation omitted);[13] *see also*

---

[12]     By contrast, G.B. asserts, Rule 41 (b)'s "sole provision addressing personal seizures, subsection (b)(4), is limited to searching for and seizing a 'person for whose arrest there is probable cause, or who is unlawfully restrained.'"

[13]     The issue in *Dionisio* was "[t]he constitutionality of the compulsory production of [voice] exemplars from a grand jury witness" — specifically,
(continued…)

*Cupp v. Murphy*, 412 U.S. 291, 294-95 (1973) (individual was seized when he was detained "only long enough to take . . . fingernail scrapings").

---

(…continued)
"whether either the initial compulsion of the person to appear before the grand jury, or the subsequent directive to make a voice recording is an unreasonable 'seizure' within the meaning of the Fourth Amendment." *Id.* at 9 (referring to the "longstanding principle that the public . . . has a right to every man's evidence, except for those persons protected by a constitutional, common-law, or statutory privilege" (internal quotation marks omitted)).

The government, too, argues that this court should be guided by the holding in *Dionisio.* Emphasizing that G.B. was a grand jury witness, the government asserts that "[c]ompelling a witness to give DNA is no more invasive of the witness's privacy than requiring testimony in the grand jury or production of a voice exemplar, neither of which offend the Fourth Amendment." We are not persuaded that the holding in *Dionisio* provides a sufficient basis for resolution of this appeal. The Court concluded in *Dionisio* that "[i]t is clear that a subpoena to appear before a grand jury is not a 'seizure' in the Fourth Amendment sense," *id.* at 8, 9, and observed that "[t]he required disclosure of a person's voice" is much further "removed from . . . Fourth Amendment protection than was the intrusion into the body effected by the blood extraction in *Schmerber*[,]" *id.* at 14, as it "does not involve [an] . . . 'intrusion upon cherished personal security,'" *id.* at 15, in the same way that an intrusion into the body, however brief, does. The Supreme Court has made it clear, however, that — unlike a grand jury subpoena — "intrusio[n][s] into the human body" are an invasion of privacy subject to Fourth Amendment scrutiny. *King*, 133 S. Ct. at 1962, 1969 (citations and quotation marks omitted). Further, while a "grand jury subpoena to testify is not that kind of governmental intrusion on privacy against which the Fourth Amendment affords protection[,]" *Dionisio*, 410 U.S. at 10 (internal quotation marks omitted), the prosecutor confirmed at the April 21, 2015, hearing before Judge Wright that this matter pertains to "a warrant that the government has requested as opposed to a subpoena by the grand jury[.]"

As the Supreme Court explained in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), however, notwithstanding privacy expectations with respect to the human body, it is not always necessary to justify independently the momentary seizure of a person that occurs when the government takes samples of the person's bodily fluids. Discussing Federal Railroad Administration regulations requiring railroad employers to perform alcohol and drug testing of railroad employees in certain circumstances, the *Skinner* Court stated:

> In view of our conclusion that the collection and subsequent analysis of the requisite biological samples must be deemed Fourth Amendment searches, we need not characterize the employer's antecedent interference with the employee's freedom of movement as an independent Fourth Amendment seizure. . . . For present purposes, it suffices to note that any limitation on an employee's freedom of movement that is necessary to obtain the blood, urine, or breath samples contemplated by the regulations must be considered in assessing the intrusiveness of the searches effected by the Government's testing program.

489 U.S. at 618. The Court further explained:

> Taking a blood or urine sample might also be characterized as a Fourth Amendment seizure, since it may be viewed as a meaningful interference with the employee's possessory interest in his bodily fluids. . . . It is not necessary . . . however, to characterize the taking of blood or urine samples as a seizure of those bodily fluids, for the privacy expectations protected by this characterization are adequately taken into account by our conclusion that such intrusions are searches.

*Id.* at 617 n.4. Analogizing to the Fourth Amendment analysis in *Skinner*, we reject G.B.'s argument that it is necessary to consider separately whether Rule 41 authorizes a seizure of the person where the search warrant application establishes probable cause to believe that the DNA to be obtained through a brief buccal swab procedure is evidence of a crime.

Moreover, assuming the brief restraint on freedom of movement entailed in the buccal swab procedure is analyzed as a "seizure," *see Cupp*, 412 U.S. at 294, it does not require independent justification, for it is a seizure that is incidental to the search authorized by the search warrant, in much the same way that the temporary detention of individuals who are present at a premises during the execution of a premises search warrant is a seizure incidental to execution of the warrant. The Supreme Court has held that the Fourth Amendment permits seizures that are incidental to authorized searches. *See Michigan v. Summers*, 452 U.S. 692, 696, 703, 705 (1981) (holding that the issuance of a search warrant "implicitly carries with it the limited authority to detain" individuals occupying the premises to be searched while the search is conducted, even though their detention is "unsupported by probable cause" to seize, and reasoning that "the detention represents only an incremental intrusion on personal liberty when the search of a

home has been authorized by a valid warrant").[14] We conclude that Rule 41 similarly permits brief seizures of persons that are necessary to facilitate, and thus that are incidental to, a search and seizure of property as authorized by warrant, and that the government need not make a separate showing of the right to seize the person.[15] Stated differently, a warrant to search a person for evidence of a crime "implicitly carries with it the limited authority" to seize and detain the person while the search is conducted." *Id.* at 705.

For the foregoing reasons, we reject G.B.'s argument that issuance of a warrant for a sample of his saliva is beyond the authority of Rule 41. The validity of what the government proposes in this case turns instead on whether the search

---

[14] The premises search in *Summers* was for contraband. G.B. correctly notes that the Supreme Court expressly did "not decide whether the same result would be justified if the search warrant merely authorized a search for evidence." 452 U.S. at 705 n.20. However, in *Muehler v. Mena*, 544 U.S. 93 (2005), in which police officers permissibly handcuffed the detainees, *see id.* at 95, 97, the Supreme Court "indicated that the *Summers* exception is a broad, categorical rule and applied it again where the search warrant was "for, among other things, deadly weapons *and evidence of gang membership*," *Gomez v. United States*, 601 F. App'x 841, 846 (11th Cir. 2015) (emphasis added); *see also Bailey v. United States*, 133 S. Ct. 1031, 1037-38 (2013) ("The rule in *Summers* . . . does not require law enforcement to have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers.").

[15] The government appears to be correct that "[n]one of the courts that have authorized searches of third parties for biological material have required a separate showing of a probable cause to seize the third party."

(and incidental seizure) would be consistent with the Fourth Amendment. We address that issue below.

## IV. Probable Cause to Search G.B.

G.B. argues that, under the Fourth Amendment, "no warrant may issue for the forcible extraction of [his] DNA if it requires his antecedent seizure without probable cause of his guilt." It is true, of course, that if the warrant had been a warrant for G.B.'s *arrest*, it could lawfully have issued only upon a finding that there was probable cause to believe that G.B. had committed a criminal offense. *See*, *e.g.*, *Byrd v. United States*, 388 A.2d 1225, 1227-28 (D.C. 1978) (stating that "the legal standard for probable cause to issue an arrest warrant" is "enough information to warrant a man of reasonable caution in the belief that a crime has been committed and that the person arrested has committed it") (internal quotation marks omitted). It is well-established, however, that, consistent with the Fourth Amendment, there may be probable cause to search (and thus probable cause for a judicial officer to issue a search warrant) even if there is not probable cause to arrest. *See Carroll v. United States*, 267 U.S. 132, 158 (1925) ("The right to search and the validity of the seizure are not dependent on the right to arrest."). The Supreme Court has interpreted the Fourth Amendment Warrants Clause

> to require only three things. First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense. Finally, warrants must particularly describe the things to be seized, as well as the place to be searched.

*Dalia v. United States*, 441 U.S. 238, 255 (1979) (citations and internal quotation marks omitted).[16]

Here, no one disputes that a buccal swab search will recover saliva containing G.B.'s DNA, which can be compared to the DNA contained in the

---

[16] *See also Dionisio*, 410 U.S. at 11 (citing *Davis v. Mississippi*, 394 U.S. 721, 727-28 (1969), which suggested that a seizure to collect fingerprint evidence might not necessarily require a showing of probable cause and left "open the question whether, consistently with the Fourth and Fourteenth Amendments, narrowly circumscribed procedures might be developed for obtaining fingerprints from people when there was no probable cause to arrest them").

G.B. asserts that "the original understanding of the Warrant Clause's requirement of 'probable cause' for seizing persons is the probability of their guilt" and that "the 'probability' in 'probable cause' refers to the likelihood that the person seized is correctly suspected of violating the law." He cites, however, to a section of Blackstone's Commentaries (Book 4, Chapter 21) entitled "Of Arrests," which discusses probable cause for an *arrest* warrant. The term "probable cause" is not limited to that context, however. "[W]e interpret 'probable cause' to mean 'reasonable grounds to believe'[,]" "a formulation that reflects the need for solid facts warranting probable cause, not mere reasonable suspicion[.]" *Oliver v. United States*, 656 A.2d 1159, 1166 (D.C. 1995).

blood found in suspect Hughes's rental vehicle. Further, there is probable cause to believe that a match will aid the government in obtaining a conviction of Hughes for stabbing G.B. And, contrary to G.B.'s argument, the momentary seizure that would be entailed in collecting his DNA via a "brief"[17] buccal swab procedure would not be similar to an arrest, which typically involves a more complete and longer-lasting restraint on an individual's liberty that may include transfer to a police station and confinement in a jail or detention in a police-dominated environment.

The probable cause to search is not negated because G.B. is a third party to the criminal proceeding against Hughes. As the Supreme Court observed in *Zurcher v. Stanford Daily News*, 436 U.S. 547 (1978), "[n]othing on the face of the [Fourth] Amendment suggests that a third-party search warrant should not normally issue[,]" *id.* at 554, and "it is untenable to conclude that property may not be searched unless its occupant is reasonably suspected of crime and is subject to arrest[,]" *id.* at 559. *Zurcher* was, as G.B. underscores, a premises-search case and did not involve a search for bodily material. However, as the government's brief points out, numerous federal and state appellate courts have held that searches

---

[17] *King*, 133 S. Ct. at 1979, 1980; *see also United States v. Amerson*, 483 F.3d 73, 84 n.11 (2d Cir. 2007) ("[A] cheek swab can be taken in seconds[.]").

pursuant to court order for the DNA or other biological material of third parties are permitted in certain circumstances (even when the third parties are, as G.B. describes himself, "free citizen[s]" with an "undiminished expectation of privacy"). *See, e.g.*, *Brotherhood of Locomotive Eng'rs v. Rossi*, 290 F. App'x 518, 518 (3rd Cir. 2008) (holding that a search warrant for blood and urine samples from a third party who was not suspected of wrongdoing was based upon probable cause where police needed "to rule out any possibility" that the victim's death was caused not by arson, but by intoxication on the part of the third party); *Commonwealth v. Draheim*, 849 N.E.2d 823, 828, 829 (Mass. 2006) (holding, in a rape case, that if there was probable cause to believe a crime was committed and that a DNA sample would "probably provide evidence relevant to the question of the defendant's guilt[,]" the state should be permitted access to the victim's DNA and to the DNA of the children born of the rapes, even though they were not parties to the underlying rape prosecution); *In re Morgenthau*, 457 A.2d 472, 475 (N.J. Super. Ct. App. Div. 1983) (holding that a warrant for a blood sample was "not to be denied on the basis that it was directed to a nonculpable third party"); *see also State v. Register*, 419 S.E.2d 771, 773 (S.C. 1992) (setting out standards for when a search warrant may issue for the blood and saliva of a third party who is not a suspect, defendant, victim, or witness in a criminal investigation).

G.B. emphasizes that the cases cited above are distinguishable because they involved adversarial motions to compel non-suspects to produce DNA or blood samples, rather than ex parte warrants of the type in issue here. G.B. asserts that "no published decision in any jurisdiction appears to have addressed an effort to obtain a warrant for a non-suspect victim's DNA." We are not persuaded that this difference makes the reasoning in these cases any less relevant to our analysis, especially given that G.B. has had an adversarial hearing (albeit pursuant to his motion to quash).[18]

## V. Reasonableness

Our resolution of this case must turn not on whether there is probable cause (or even suspicion) that G.B. is guilty of a crime, and not (solely) on his status as a third-party victim, but rather on the reasonableness of the proposed search. "[T]he 'touchstone of the Fourth Amendment is reasonableness[.]'" *King*, 133 S. Ct. at

---

[18] We are inclined to agree with the Supreme Judicial Court of Massachusetts that before a warrant issues to permit a bodily search of a third party who is not a suspect, the third party "must be given notice and an opportunity to be heard at an adversary hearing[.]" *Draheim*, 849 N.E. 2d at 829; *cf. Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1061 (Colo. 2002) (en banc) (holding that "an innocent, third-party bookstore must be afforded an opportunity for a hearing prior to the execution of any search warrant that seeks to obtain its customers' book-purchasing records").

1970 (quoting *Samson v. California*, 547 U.S. 843, 855 n.4 (2006)); *see also Sheffield v. United States,* 111 A.3d 611, 622 (D.C. 2015) ("[R]easonableness is the overarching and underlying principle" of Fourth Amendment case law.) An appellate court reviews de novo the ultimate determination of the reasonableness of a search. *Akinmboni v. United States*, 126 A.3d 694, 697 (D.C. 2015).

The reasonableness inquiry has many facets. The first "critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property for which entry is sought." *Zurcher*, 436 U.S. at 556. Applied in this case, which involves an intrusion into the body, this principle protects G.B.'s "interests in human dignity and privacy" by "forbid[ding] any such intrusions on the mere chance that desired evidence might be obtained." *Schmerber*, 384 U.S. at 769-70 (recognizing that the reasonableness of a blood test procedure aimed at measuring blood-alcohol level is affected by the fact that "percentage of alcohol in the blood begins to diminish shortly after drinking stops"). The principle is satisfied here because there is no dispute that the buccal swab will extract saliva containing G.B.'s DNA. Further, for the proposed search to be reasonable, the government "must . . . show . . . a clear indication that material evidence relevant to the question of the suspect's guilt will be found[.]"

*Register*, 419 S.E.2d at 773.[19]  We are satisfied that the search-warrant affiant made that showing here by averring that police have (suspected) blood evidence, from the suspect's rental vehicle, to which victim G.B.'s DNA can be compared, as well as reason to believe, based on the statement of W1, that the suspect came in contact with G.B.'s blood at the crime scene.[20]

---

[19]  The court in *Register*, like some other courts, also listed as a factor pertinent to the reasonableness of a bodily intrusion "the importance of the evidence to the investigation[.]"  *Id.*  We agree with the observation by a different court, however, that "[a] search warrant is not invalidated because law enforcement may already have sufficient evidence to prosecute a crime[,]" especially given the "difference between the degree of certainty required for probable cause and that required to convict beyond a reasonable doubt."  *United States v. Johnson*, No. 3:11-CR-139 JD, 2012 U.S. Dist. LEXIS 77114, *9 (N.D. Ind. June 4, 2012); *see also Rutledge*, 283 A.2d at 216, discussed *supra*. *But see State v. Haynie*, 242 S.E.2d 713, 714-15 (Ga. 1978) (holding that it "could not be a reasonable search . . . to require the victim of a crime to undergo surgery against his will to remove a bullet lodged an inch from his spine, even if medical testimony could be produced that the operation would not be dangerous to his health[,]" because "evidence that the bullet in the victim was not fired from the gun claimed by Haynie to have been in his possession at the time of the shooting incident would not be conclusive evidence of his innocence" and because, in light of the testimony of eyewitnesses "that they saw the defendant . . . shoot the victim[,]" "the guilt or innocence of the defendant does not rest entirely on ballistic testimony concerning the gun and the bullet").

[20]  The search warrant affidavit states that two swabs of "suspected" blood were collected from the side of the driver's seat in Hughes's vehicle.  Unless the "suspected" blood found in Hughes's vehicle is indeed blood, there may be no reason to believe that DNA can be extracted from that evidence for comparison to G.B.'s DNA.  But the affidavit establishes sufficient reason to believe that the "suspected" blood *is* blood; according to the affidavit, W1 saw Hughes slashing at G.B. with a knife, saw G.B. bleeding, and saw Hughes attempt to clean up his blood before leaving the apartment where the incident occurred.  (In addition, as

(continued…)

There is also the requirement that any "compelled intrusion into the body" be "performed in a 'reasonable manner.'" *Skinner*, 489 U.S. at 616, 625. The execution of a search is most likely to be reasonable when "for most people the procedure involves virtually no risk, trauma, or pain[,]" and when the sample is taken by the appropriate practitioner and in the appropriate location. *Schmerber*, 384 U.S. at 771 (finding a blood test reasonable when "taken by a physician in a hospital environment according to accepted medical practices"). Those factors, too, are satisfied here. The Supreme Court has recognized that the buccal swab causes "virtually no risk, trauma, or pain[,]" *King*, 133 S. Ct. at 1979 (internal

---

(…continued)

his counsel told Judge Wright, G.B. does not dispute that the blood found at the crime scene is his.) We are satisfied that the affidavit furnishes probable cause to believe that the swabs from the vehicle contain DNA to which G.B.'s buccal swab DNA can be compared. G.B. argues that even if his blood is in Hughes's car, that would be consistent with W1's statement that Hughes attempted to clean up the bloody scene and would not help the government establish that Hughes also stabbed G.B. However, we have no basis for assuming that Hughes will concede that she was in the apartment and attempted to clean up G.B.'s blood.

The instant case is quite different from *Commonwealth v. Kostka*, 31 N.E.3d 1116, 1119, 1121 (Mass. 2015) (holding that the Commonwealth did not make an adequate showing with respect to its effort to obtain an order compelling a DNA sample from Christopher, the twin of defendant Timothy, because laboratory testing had not yet identified Timothy as even a potential contributor to the DNA found under the victim's fingernails; reasoning that "[w]ithout evidence that Timothy's DNA was found at the crime scene, Christopher's DNA would serve no purpose" and that the Commonwealth's "asserted need for Christopher's DNA rests in part on speculation that Timothy will . . . use the fact that he has a twin to suggest doubt as to the source of the DNA found under the victim's fingernails").

quotation marks omitted),[21] and buccal swabbing "may be conducted safely outside a hospital environment[,]" *Brewer*, 799 F.3d at 1302. An additional relevant factor is whether the circumstances of the search (and incidental seizure) are "demeaning" or "involve[e] social stigma[,]" *Dionisio*, 410 U.S. at 10, or "would subject . . . innocent persons to . . . harassment and ignominy[,]" *Davis*, 394 U.S. at 726.[22] Here, this factor weighs in favor of issuance of a warrant because the buccal swab procedure can be conducted virtually anywhere, including at the victim's home or other private location, "with a minimum of inconvenience or

---

[21]  *Cf. Winston v. Lee*, 470 U.S. 753, 759, 765-67 (1985) (balancing the defendant's privacy interests against the community's need for evidence, and holding that defendant could not lawfully be forced to undergo surgery to recover a bullet lodged in his chest, because the prosecution had ample evidence to prosecute the case without resorting to an invasive surgical procedure requiring the use of a general anesthetic, the medical risks of which were "subject of a considerable dispute"); *People v. Browning*, 166 Cal. Rptr. 293, 297 (Cal. Ct. App. 1980) (applying the principle that "the more intense, unusual, prolonged, uncomfortable, unsafe or undignified the procedure contemplated, or the more it intrudes upon essential standards of privacy, the greater must be the showing for the procedure's necessity"; holding that to grant the defendant's request for an order requiring a gunshot victim who still had bullets in his body to have the bullets surgically removed "would be an unreasonable intrusion into his body which is proscribed under the Fourth Amendment").

[22]  In *Davis*, the Supreme Court held that it was the dragnet detention at police headquarters of "at least 24 Negro youths" that violated the Fourth and Fourteenth Amendments, not the taking of their fingerprints. 394 U.S. at 722. The Court held that "[i]nvestigatory seizures [that] would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention" violate the Fourth Amendment. *Id.* at 726.

embarrassment." *Brewer*, 799 F.3d at 1302 (internal quotation marks omitted). And, like a subpoena to appear before the grand jury, a warrant to take a buccal swab "involves no stigma whatever; if the time . . . is inconvenient, this can generally be altered;"[23] and, when conducted pursuant to warrant, the procedure would be "under the control and supervision of a court[,]" a safeguard against harassment. *Dionisio*, 410 U.S. at 10 (internal quotation marks omitted).

Courts have recognized that additional factors relevant to whether a bodily search is reasonable for Fourth Amendment purposes include the seriousness of the crime and society's concomitant interest in obtaining a conviction, and the unavailability of less intrusive means of obtaining the evidence.[24] In this case, we agree with the government that the seriousness of the crime weighs in favor of the search. Further, courts have recognized the "minimally intrusive nature of a buccal swab[.]" *Kostka*, 31 N.E.3d at 1121; *King*, 133 S. Ct. at 1979.

---

[23] We note that during the hearing on April 21, 2015, in response to a question about "how notice would get to [G.B.] to appear at a particular date and time so that [the buccal swab procedure] could be facilitated[,]" Judge Wright told the parties that he would "probably . . . set up a telephone conference call to get an agreed upon date."

[24] *See, e.g.*, *Browning*, 166 Cal. Rptr. at 297; *Kostka*, 31 N.E.3d at 1119; *Draheim*, 849 N.E.2d at 829; *Register*, 419 S.E.2d at 773.

Finally, a factor that weighs in favor of the reasonableness of the search the government seeks to conduct is the limitations the trial court placed on further use of the fruits of the search (limitations the government has not challenged in this case). *See King*, 133 S. Ct. at 1979-80 (upholding, in the context of a post-arrest inventory search, reasonableness of DNA test where federal statute limited the information that could be gleaned from the DNA, as well as the uses to which that information could be put). As described above, Judge Wright's orders prohibit the government from entering G.B.'s DNA into any database, from using the DNA in any future matter, and from using the DNA evidence to prosecute G.B. for perjury. The orders also require the government to destroy any remaining DNA from the sample at the conclusion of the case against Hughes.[25]

Weighing all of the relevant factors against G.B.'s privacy interest, we conclude that the balance is in favor of the proposed search. We hold that the Fourth Amendment will not be violated by a buccal swab search (and incidental seizure) of G.B. for the purposes of collecting his DNA for the limited purposes Judge Wright's order permitted.

---

[25] We do not imply that each of these limitations is a *sine qua non* of reasonableness of the intended search in this case, or that any or all of these limitations would be required in other cases. We mean to say only that the limitations help to remove any doubt there might otherwise be about the reasonableness of the search Judge Wright authorized.

## VI. Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed.  If the government still intends to proceed in the criminal matter against Hughes, a warrant authorizing the government to take a buccal swab sample of G.B.'s saliva may issue, subject to the limitations on use and retention of the DNA imposed by the trial court in its May 4, 2015, written order.[26]

*So ordered.*

---

[26]  See *supra* note 5.

NEBEKER, *Senior Judge*, concurring: My colleagues correctly assess the reasonableness of both the scope and manner of obtaining buccal swab. *See Maryland v. King*, 133 S. Ct. 1958, 1970 (2013) (requiring a search to "be reasonable in its scope and manner of execution"). However, I do not read *King* their way when the majority asserts that an additional factor "in favor of the reasonableness of the search" is the limitations placed on the future use of the DNA. *King* looked at a Maryland statute allowing for the DNA collection of arrestees at the time of booking and entry of the DNA into the Combined DNA Index System ("CODIS"), which the Court upheld as a reasonable search based upon the brief, physically harmless intrusion into the body and numerous government interests outweighing the individual's privacy interest. *Id.* at 1968, 1980. The Court dismissed any concern that additional information beyond mere identification could be gathered from the non-coding portions of the collected DNA; that is, the DNA did not reveal other information such as genetic traits. *Id.* at 1979. Because no additional information could be gathered beyond identification, the Court determined there would be no further invasion of privacy. *Id.* at 1980 ("In light of the scientific and statutory safeguards, . . . [there is not] a significant invasion of privacy . . . ."). The Court did not consider whether limitations on future use of DNA evidence for identification purposes was a factor

in determining the reasonableness.[1]   Additional reliance on limitations to inform the reasonableness analysis is unnecessary.

We correctly consider the factors weighing on reasonableness including the invasiveness of the buccal swab search, the search being performed in a reasonable manner, and the seriousness of the offense with society's interest in a conviction. None of these factors support destruction or limiting use of the DNA evidence for identification thereafter.   Destroying the evidence does not make the search any more or less invasive at the time it occurred or make the manner performed any more or less reasonable.   Moreover, entering the DNA into the database will have additional salutary effects:  e.g., of exonerating those wrongly accused of crimes or even identifying human remains.  *See id.* at 1974 (furthering the "salutary effect of freeing a person wrongfully imprisoned for the same offense").

Finally, ordering destruction or limiting the use of DNA evidence is a public policy determination to be made by the legislature.   The government has not argued on appeal that these limitations are inappropriate, but we should not tacitly

---

[1]    In particular, the Court described Maryland's statutory limitations for destroying DNA evidence when certain situations are present, *id.* at 1967, but the Court did not rely on the destruction of evidence in its analysis, *see id.* at 1979-80.

endorse them. There is nothing logical in limiting possible future use of evidence lawfully obtained in compliance with the constitution.